CASE 93—PETITION EQUITY—OCTOBER 23

# Howard v. Howard.

### APPEAL FROM BOURBON CIRCUIT COURT.

1. PERSONS OF UNSOUND MIND—ACTION BY NEXT FRIEND.—Under subsection 3, of section 35, of the Civil Code, a person of unsound mind having no committee may sue by his next friend; and the expression, "person of unsound mind," as used in that section, embraces not only lunatics but persons whose minds have become so impaired by disease or other cause as to be unable to take care of their own interests.

2. SAME—PREJUDICIAL ERRORS.—When an action has been thus brought by one styling himself as next friend of an adult person alleged to be of unsound mind, and the person in whose behalf the action purports to be brought appears in court and protests that he is not of weak or unsound mind, and that the suit was instituted and is prosecuted without his authority and against his will, the chancellor should direct an inquiry as to whether his mind is so impaired as to render him incapable of understanding and appreciating his property rights to such an extent as to render him unable to protect himself against designing persons; and if the verdict of the jury be in the affirmative, the chancellor should appoint a committee for the person and allow the person thus appointed to prosecute the suit in his name; but if the verdict should be in the negative, then the suit should be dismissed, unless the court, from the evidence before the jury, should deem it proper to take other steps in the matter.

    The chancellor erred in this case in not directing an inquiry by a jury, as above indicated; but as the person alleged to be of unsound mind has died since the appeal was taken, and the case has been revived in the name of his heirs, to whose interest it is to have the judgment affirmed, the court will not reverse for an error entirely personal to the decedent, and which could in no manner affect the rights of the defendant, the surviving appellant.

3. DEEDS—MENTAL CAPACITY OF GRANTOR.—As the deed sought to be set aside in this case was executed by the grantor without any adequate consideration, and when his mind from age, disease and excessive use of whisky had become so impaired as to render him incapable of understanding the value of his property and of disposing of it by sale or otherwise, the judgment of the chancellor granting the relief sought must be affirmed.

Howard v. Howard.

EMMETT M. DICKSON FOR APPELLANT.

1. One can not prosecute an action as next friend for an adult alleged to
be of unsound mind, without an order of court authorizing him to do
so, nor without a previous judicial finding that the person repre-
sented is of unsound mind. (Gen. Stats., chapter 53, art. 1, secs. 1, 2
d 4; Nailor v. Nailor, 4 Dana, 339; Newland on Contracts, 17;
2 Maddocks' Chancery, 728; Shaw v. Dixson, 6 Bush, 645.

2. The contract of a person of unsound mind is to be treated as that of an
infant. (Wald's Pollock on Contracts, 96; Rusk v. Fenton, 14 Bush;
Chitty on Contracts, 150; Coleman v. Fraser, 3 Bush, 300.)

RUSSELL MANN AND McMILLAN & TALBOTT FOR APPELLEE.

When there is no committee the next friend may bring an action with-
out a previous inquisition and judgment of lunacy. (Wilson v. Wil-
ham, 12 B. M., 55; Civil Code (New), sec. 3, subsection 3; Old Code,
sec. 58; Newcomb v. Newcomb, 13 Bush, 578.)

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

The appellee, Matt Howard, claiming to sue as the
next friend of Elijah Howard, filed his petition in the
Bourbon Circuit Court against John Howard, in which
he sought to annul and set aside a deed executed by
Elijah Howard to John Howard, by which the former
conveyed to the latter about one hundred and fifteen
acres of land. The appellee sought to set aside said
conveyance upon the ground that Elijah Howard, at
the time of making it, was, from age and disease, too
weak in mind to understand the nature of said con-
tract, and to resist the arts and wiles of the appellant,
who exercised them upon said Elijah, for the purpose
of defrauding him, and did fraudulently induce him
to make said contract.

Elijah Howard filed an affidavit in the case, in which
he alleged that he was not of weak or of unsound
mind; that he understood the nature and scope of
said contract · that it was for a valuable considera-

tion, and he wished it to stand; that the suit was brought without his authority and against his will, and he wished it dismissed; he accordingly moved the court to dismiss it; but the court overruled his motion. He thereafter tendered and requested permission to file an answer, in which he set up substantially the facts stated in his affidavit; but the court overruled his motion to file it.

The appellant, John Howard, by his answer, put in issue the appellee's allegations of fraud, want of consideration, and the weakness or unsoundness of Elijah Howard's mind, etc.

The chancellor, upon final hearing, set aside said contract, and John and Elijah Howard have appealed to this court. Since the appeal Elijah Howard has departed this life, and the case has been revived in the name of his brothers and sisters—his next of kin— who, owing to their interest being on the side of the judgment of the lower court, must be regarded as appellees, and seeking to affirm the judgment of the lower court.

The appellant contends that the chancellor, upon the affidavit and motion of Elijah Howard to dismiss the case, had no jurisdiction to proceed with the case to a hearing and judgment upon its merits; but he should have issued a writ of inquisition out of chancery for the purpose of having a jury try the issue as to whether or not Elijah Howard was an imbecile; if yea, to appoint a committee to prosecute said suit; if nay, to dismiss it.

By the English chancery practice the court had no inherent and general jurisdiction of idiots and lunatics

as it did of infants.   The king, as *parens patriae*, exercised executive power over idiots and lunatics, which power he "delegated to the chancellor, as a personal representative of the crown, by means of an official instrument called the 'Sign Manual,' signed by the king's own signature, and sealed with his own privy seal."   The power thus conferred was exercised by the chancellor alone, and not by the court.

This special jurisdiction of the chancellor was exercised as follows : Some friend of the alleged lunatic or idiot would address a petition to the chancellor personally, setting forth the fact that such person was a lunatic or idiot ; thereupon, the chancellor would issue a special commission, directing a judicial inquisition of the alleged idiocy or lunacy, which was always tried by a jury ; so long as their finding stood unimpeached it was conclusive.   Upon the return of the commission and inquisition, if the party was found to be a lunatic or idiot, the chancellor appointed a committee, whose duty it was to take charge of the person and property of the lunatic or idiot.   This committee, in his character as trustee for the lunatic or idiot, became subject to the jurisdiction of the court of chancery ; that is to say, as the court of chancery had inherent and general jurisdiction over trusts and trustees, it acquired jurisdiction of the person and property of the idiot or lunatic through his committee, whose office was in the nature of that of a trustee.

This court, in the cases of Nailor v. Nailor, 4 Dana, 339, and Shaw v. Dixon, 6 Bush, 644, decided that a court of equity had no jurisdiction to hear and determine, upon its merits, a case brought by a person to set

aside a sale of another person's property upon the ground that such person was of unsound mind and incompetent to make the sale. But where the petition set up facts showing that such person was of unsound mind, and not capable of taking care of his property, the chancellor would not dismiss it, but would treat it as an information, upon which he would direct an inquisition against such person to be tried by a jury, and if he was found to be of unsound mind, then the court would appoint a committee to take charge of his person and estate, and to prosecute in his name the action instituted by such person.

In the cases, *supra*, the persons filing said petitions did not file them in the name of the alleged imbeciles as their next friend; nor did they have such a direct interest in the property as would entitle them to bring suit in their individual names, or in conjunction with the alleged imbeciles, to set the sale aside. Also, in the cases, *supra*, this court not only recognized and adopted, in substance, the English chancery practice in reference to lunatics and idiots, but extended the practice to such persons who, by reason of age or disease, had become imbeciles or unsound in mind to such an extent as to render them incapable of taking care of their property, &c.

By subsection 3, of section 35, of the Civil Code, it is provided as follows: "The action of an infant, or of a person of unsound mind, who resides in this State, and who has no guardian, curator or committee residing herein, or whose guardian, curator or committee refuses to sue, or his action against his guardian, curator or committee may be brought by his next friend."

The expression, as used in the foregoing section, "person of unsound mind," embraces not only lunatics, but persons whose minds have become so impaired or infirm by age, disease or other cause, as to be unable to take care of their own interests.

Said section, in respect to allowing a lunatic having no committee, etc., to sue by his next friend, makes an innovation upon the elementary chancery practice, which, as we have seen, did not allow a lunatic to sue by his next friend; but in reference to persons of weak or unsound mind said section, by allowing them to sue by a next friend, simply declared a rule of chancery practice. For, as said in Pomeroy's Equity Jurisprudence, volume 3, section 1314: "The special jurisdiction above described is confined to persons who may be, and are adjudicated or found to be, lunatics, idiots, or *non compos mentis*. The very first step, in order that the court may, through a committee, control the person and property of the particular individual, is a proceeding by which he is judicially determined to belong to the status of lunatics or *non compos mentis*. In addition to this peculiar authority, the court of equity may, in appropriate cases, in pursuance of its inherent general powers, protect the property of persons of weak or unsound mind, who have not been, and who even can not be, judicially found *non compos mentis*. These two jurisdictions are wholly distinct. The former is special; the latter is the 'general jurisdiction of equity 'exercised not by reason of the incompetency, but notwithstanding the incompetency.' The court can only exercise such equitable jurisdiction as it could under

the same circumstances have exercised at the suit of the person himself, if he were of sound mind.'' The author refers in the above section to the suit of a person of weak or unsound mind by his next friend.

Having seen that a person, under the section of the Civil Code, *supra*, as well as under the chancery practice, of weak or unsound 'mind, who has no committee, may sue by his next friend, the further question arises: What is the proper course to pursue in case the person, who is an adult, and alleged to be of weak or unsound mind, appears in court and protests that he is not of weak or unsound mind; and that the suit was instituted and is prosecuted without his authority and against his will?

The law presumes all persons to be of sound mind, and if adults, capable of managing their own affairs; and the mere fact that it is alleged by a person styling himself next friend, that a particular individual, who is an adult, is of weak or unsound mind, and not capable of taking care of his own affairs, does not destroy that presumption. But where the action is brought in the name of the person alleged to be of weak or unsound mind, by his next friend, against parties having an interest in the subject-matter, it is to be presumed, in the absence of any thing appearing to the contrary, that whatever consent such person is capable of giving to the bringing of the action has been obtained; and that it is in fact his suit, for it is really in his name; and that he has obtained the consent of a friend, as the most competent person by whom he wishes his case to be conducted, in order that his rights may be the better protected. But if

he makes known to the court that it is not his suit; that he is competent to take care of his own affairs; that the supposed friend is in fact an intermeddler, the court in such a state of case is presented with the question: What is the proper course to pursue?

The individual liberty of the person is involved. His right to dispose of himself, also of his property by sale, gift or otherwise, as he pleases, is at once recognized as an absolute right, which he can not be deprived of by any court of the land—not even the highest—unless it be made to appear that he, by age, disease or other cause, has ceased to be a man, by so far losing his mind as to be incapable of taking care of his property, and has become the victim of shrewd and designing persons.

But when he puts in issue the charge that he has thus ceased to be a man, and has become a mere hulk, how is the fact to be determined? It seems to us that the issue, which thus involves his personal liberty, should be settled by his peers—a jury of his country. And, for that purpose, the chancellor should issue his writ out of chancery, directing an inquiry, by a jury, into the fact as to whether the mind of the person is so impaired by age, disease or otherwise, as to render him incapable of understanding and appreciating his property rights to such an extent as to render him unable to protect himself against designing persons; and upon the verdict of the jury, if in the affirmative, the chancellor should appoint a committee for the person, and allow him to prosecute the suit in his name; but if the verdict should be in the negative, then the suit should be dismissed;

unless the court, from the evidence before the jury, should deem it proper to take other steps in reference to the matter.

It will be readily seen from what has been said that the chancellor erred in not, upon the issue raised by Elijah Howard, taking the course above indicated.

But since this appeal was taken, Elijah Howard has departed this life intestate, and the case has been revived in the name of his heirs; and the judgment of the lower court being in their favor, they stand in this court as asking an affirmance of the judgment, notwithstanding the error that was committed to the prejudice of Elijah Howard.

The said error was in reference to the rights of Elijah Howard alone and his representatives, which consisted in the refusal of the chancellor, under the circumstances above-named, to have a jury empaneled to pass upon the condition of his mind, and in assuming to pass upon that question himself. The error of the court was entirely personal to Elijah Howard and his representatives. If the latter were asking a reversal of the case on account of said error of the court, they would be entitled to it; but they are not asking a reversal. Therefore, to reverse the case at the instance of the appellant, whose rights were not affected by the error committed by the court against Elijah Howard, would not have the effect to dismiss the case on account of such error, but to send it back for another trial by the chancellor, the right in question having ceased at the death of Elijah, upon the proof as it now is. Therefore, if the proof does not sustain the allegations of the petition, then it should be dismissed, and

the appellant will be made secure in his contract of purchase.

On the other hand, if the proof sustains the allegations of the petition, then, in equity and good conscience, the contract, as the case now stands, ought to be set aside. Therefore, the question arises : Does the proof sustain the judgment of the lower court?

Without going into the proof in detail, for it would make this opinion too long, it is clearly shown by the proof that Elijah Howard's mind from age, disease and excessive use of whisky, had become so much impaired as to be incapable of understanding and appreciating the value of his property, and of judiciously disposing of the same by sale or otherwise ; and that the appellant knew that such was the fact ; and that the appellant had great influence over him ; that the appellant did influence him to convey to him, the appellant, said tract of land, which was worth at least forty dollars per acre, without any adequate consideration therefor ; for the proof clearly shows that the work and labor of Elijah Howard's wife for the appellant, from 1871 until her death in 1879, and the property and money that Elijah Howard let the appellant have, were worth the board of Elijah and his wife from 1871 until her death, and his board from that period until the said deed was made in 1883 ; and that the use of said tract of land, which the appellant had from the time of said conveyance, was worth Elijah's board from and after said period.

The judgment of the lower court is affirmed.